SHIVERS, Judge.
The former employer/self-insured, City of Miami (“City” or “Appellant”), appeals the order of the Judge of Compensation Claims (“JCC”) requiring Appellant 1) to pay Claimant permanent total disability (“PTD”) benefits, commencing February 12, 1976, and continuing to date, 2) to pay Claimant’s wife for nursing services at the federal minimum wage rate in effect on July 28, 1987, for 40 hours per week, 3) to administratively pay the outstanding medical and hospital costs incurred by Claimant to date, including psychiatric hospitalization and treatment, and to continue to provide Claimant with medical treatment and care as his injury requires, and 4) to pay costs of the proceeding below. We reverse and remand for the JCC to make further specific findings consistent with this opinion.
While he was a motorcycle policeman employed by the City, Claimant suffered a compensable industrial accident on March 31, 1970, resulting in injury to his lower and middle back. Appellant paid temporary total disability (TTD) benefits from the date of the accident through February 12, 1976, when the City administratively accepted Claimant as PTD. Permanent partial disability (PPD) benefits were paid from the date of the accident through November 1975. The City Pension Board granted a disability pension as of May 8, 1971. Claimant also received other supplemental disability benefits, and reached maximum medical improvement on April 5, 1975. PTD benefits were paid from February 12, 1976, until 1987, when the City filed a notice to contravene all benefits as of June 27, 1978. The City suspended Claimant’s medical and PTD benefits in August 1987, alleging he had demonstrated a greater wage-earning capacity and had actually worked more hours after being accepted as PTD. See Malm v. Holiday Theatres, 560 So.2d 270, 271 (Fla. 1st DCA 1990); Hall v. City of Jacksonville, 443 So.2d 326, 327 (Fla. 1st DCA 1983) (change in condition, as basis for petition for modification, may encompass a change in wage-earning capacity, even if a claimant’s physical condition remains unchanged); Lister v. *896 Walker, 409 So.2d 1153, 1155 (Fla. 1st DCA 1982). Compensation benefits were cut off in December 1987. Claimant maintained the City was aware of his subsequent employment, although he never specifically notified the City.
Appellant based its termination of benefits on evidence that Claimant was employed in various capacities with other employers after the 1970 accident. See City of Miami v. Knight, 510 So.2d 1069 (1st DCA), rev. den., 518 So.2d 1276 (Fla.1987), reversed on other grounds, Barragan v. City of Miami, 545 So.2d 252 (Fla.1989); see also section 440.15(1), Florida Statutes (1987). Claimant testified he began working as a credit card fraud investigator at a division of Southeast Bank six or eight months after the March accident. Barnett Bank (“Barnett”) hired him in April 1975 and transferred him to the Barnett Visa Center in April 1976. He worked for Barnett for between four and five years. Claimant also held a part-time job as an investigator for the Carillon Hotel but left following a 1978 reduction in personnel. He then performed security work for the Doral Hotel on three nights a week, from 6:00 P.M. to 2:00 A.M., during the tourist season. He was dismissed from Barnett for violating company rules and has not been employed since 1979.
Claimant underwent numerous lumbar spine or cervical spine surgeries, and was treated for multiple fractures, during the decade following his 1970 back injury. On June 27, 1978, he was involved in an automobile accident that, according to Claimant, occurred shortly after he left Mercy Hospital from a scheduled medical appointment with Dr. Kalian, an orthopedic surgeon. Claimant was admitted to the hospital complaining of pain in his lower back, neck, elbow and leg. He filed a workers’ compensation claim with Barnett that resulted in a $7,500 “washout” payment to Claimant.
On November 19, 1979, Claimant sustained injuries after running a red light in a Barnett company ear. Initially, he alleged the accident occurred while he was going to interview a witness concerning a credit fraud investigation. His explanation changed in several material respects during the subsequent investigation, however, and the claim was denied in 1981 because it did not relate to the course and scope of employment.
Until 1980, when Claimant and his family moved to Georgia, he remained under the care of Dr. Kalian. Following the 1970 accident, Claimant received the prescription drug Thorazine in high doses over a 10-year period as a muscle relaxant to treat muscle spasms. His neurologist in Georgia, Dr. Pedersen, testified about an October 21, 1971, Mercy Hospital discharge summary record indicating Claimant was “positively snowed on Thorazine in the hospital.” Pedersen said Claimant was diagnosed in 1986 as having tardive dystonia and tardive dyskinesia, movement disorders that resulted from the “cumulative effect of that medication.” Dr. Pedersen referred Claimant to a psychiatrist for treatment of severe depression as a result of his medical condition. Pedersen testified that the psychiatrist and Claimant’s wife had provided “assistance in the prevention of suicide.” His neck is involuntarily held in a fixed position and he has abnormal involuntary movements of the body and tongue. Dr. Pedersen characterized Claimant as having a “very bad problem,” with an “extremely poor” prognosis for recovery from the neck disability. Claimant, who is in his mid-50’s, remains in bed most of the time and depends on his wife to bathe, shave and dress him. The testimony of Drs. Kalian and Pedersen indicates Claimant is presently totally disabled.
We find the order appealed is erroneous in several respects. First, the requirement that the City pay PTD benefits to Claimant commencing February 12, 1976, ignores the fact that the City has already paid PTD benefits to Claimant from that date until 1987. On remand, the JCC shall determine for what period of time any additional PTD benefits are due and owing for the period after the 1987 termination of such payments by Appellant.
*897 Second, in paragraph five of the order, the JCC found Claimant “suffered two subsequent intervening automobile accidents in 1978 and 1979, which produced a temporary aggravation of his pre-existing disabilities attributable to the 1970 accident.” The record demonstrates that following his 1978 automobile accident, Claimant filed a claim not with the City, but with his employer then, Barnett. On appeal, however, relying on Telcon, Inc. v. Williams, 500 So.2d 266 (1st DCA 1986), rev. den., 508 So.2d 15 (Fla.1987), Claimant maintained that the 1978 accident and resulting injuries were related to the 1970 accident. On remand, the JCC must make a specific finding concerning this conflicting evidence on the issue of whether the 1978 accident related to the 1970 accident. Dr. Kalian testified Claimant had not indicated any history of neck problems when treatment by Kalian began in August 1975. Kalian referred to his dictated medical notes on Claimant, made after the 1978 accident, showing “he now has neck and right elbow discomfort as well,” and “these were new situations other than what we had seen him for previously.” The order does not address the evidence that Claimant complained of neck, elbow and leg injuries only after the 1978 and 1979 accidents, but not before.
If the JCC determines the 1978 accident and injuries did not result from a necessary medical visit with Dr. Kalian for treatment of the prior injuries, then apportionment is necessary in accordance with the principles set forth in Parish v. Baptist Hosp., 512 So.2d 1031 (Fla. 1st DCA 1987) and Department of Pub. Health v. Wilcox, 458 So.2d 1207 (Fla. 1st DCA 1984). See Newhouse v. Volusia County Sch. Bd., 474 So.2d 1222 (Fla. 1st DCA 1985) (deputy commissioner was required to apportion and award benefits due independently from prior industrial accidents, where subsequent automobile accident aggravated injuries and was noncompensable); Jackson v. Indian River County Sch. Bd., 596 So.2d 1130 (Fla. 1st DCA 1992); Department of Pub. Health v. Wilcox, 483 So.2d 21 (Fla. 1st DCA 1985).
Relying on Dr. Pedersen’s deposition testimony, the JCC found “all of the claimant’s present physical impairments and restrictions were due solely to the residual effects of his 1970 injury, primarily from the claimant’s prolonged use of Thorazine during the past 10 years which was prescribed by his attending physician.” Ped-ersen, who first treated Claimant in 1986, said that “very little” and “possibly 20%” of his treatment was for Claimant’s back problem, while 80% was for the dystonia. Pedersen acknowledged Claimant’s neck injuries resulted from the subsequent accidents, not from the 1970 accident, and the subsequent accidents contributed to Claimant’s present condition to the extent he was treated for more symptoms and injuries with additional or higher doses of Thorazine. This evidence, as well as the evidence pertaining to nursing services, medical and hospital costs, and psychiatric care and treatment, is relevant to whatever finding the JCC makes on the issue of apportionment.
Claimant asserts that a clarification of paragraph five is needed to indicate Dr. Kalian did not testify it was absolutely impossible to apportion any of Claimant’s disability among the three accidents. We agree. Our examination of Dr. Kalian’s testimony, in the context of the entire deposition, indicates he had no independent recollection of the events from 11 years past, nor did he have with him “a decent set of records,” as a result of lost, misplaced, and loaned-out medical files.
REVERSED and REMANDED, with instructions.
WIGGINTON and BARFIELD, JJ„ concur.